IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 2:04-cr-0144-GEB |
| Plaintiff, | ) | |
| | ) | ORDER |
| v. | ) | |
| JAMES R. BALLESTEROS, | ) | |
| Defendant. | ) | |

The government moves for an order which would authorize the United States Medical Center for Federal Prisoners in Springfield, Missouri ("USMCFP") to attempt to restore James R. Ballesteros's competency to stand trial by involuntarily medicating him with antipsychotic drugs.  The motion is made under the Supreme Court's decision in Sell v. United States, 539 U.S. 166 (2003), and is opposed.  Hearings on the motion were held September 30, 2005, and November 4, 2005, and the motion was argued on January 20, 2006.[1]

--------

[1]
    The parties agreed at the September 30 hearing to schedule oral argument after the hearing.  When counsel failed to propose a date as soon as expected, the Court Deputy Clerk communicated with counsel about scheduling, and the January 20 date was subsequently set.

<u>Background</u>

On April 8, 2004, Ballesteros was charged by indictment with attempted murder under 18 U.S.C. § 1114, assaulting a federal law enforcement officer under 18 U.S.C. § 111, and use of a firearm in relation to a crime of violence under 18 U.S.C. § 924(C)(1).  The indictment alleges that Ballesteros fired multiple gunshots at two United States Forest Service Law Enforcement Officers while they engaged in official duties.

On May 5, 2005, Ballesteros's counsel filed a motion for a hearing on Ballesteros's mental capacity to stand trial which was supported by the declaration of defense counsel, in which he declared:

> [T]here [is] reasonable cause to believe that Mr. Ballesteros may be presently suffering from a mental disease or defect which renders him mentally incompetent to the extent that he is unable to assist properly in his defense.
>
> Because of [counsel's] concerns regarding Mr. Ballesteros's mental health, [counsel] retained Dr. Cameron Quanbeck, M.D., psychiatrist and assistant clinical professor of psychiatry, Division of Forensic Psychiatry, U. C. Davis Medical Center, to assist [counsel] in representing Mr. Ballesteros.  Dr. Quanbeck has visited and evaluated Mr. Ballesteros at the Sacramento County Jail.
>
> Based upon his evaluation of Mr. Ballesteros, Dr. Quanbeck has concluded that Mr. Ballesteros is currently mentally incompetent to stand trial.

(Decl. of Quin Denvir attached to Mot. for Hearing on Mental Competency of Def. to Stand Trial at 4-5.)

Based on this unopposed motion to have the mental competency of Ballesteros examined, an Order was filed on May 17, 2005, that committed Ballesteros to the Bureau of Prisons for determination of his competency to stand trial.  Ballesteros was

2

subsequently received at the USMCFP on June 9, 2005, for
psychological evaluation and treatment under 18 U.S.C. § 4241(d).

On June 21, 2005, the Court received a letter from USMCFP
in which it stated Ballesteros would remain at the facility for up
to 120 days so that his competency could be restored.  Another
letter was received on July 25, 2005, in which the Court was
informed that "antipsychotic medication would assist in restoring
[Ballesteros's] competence to stand trial," but Ballesteros refused
the medication.

On September 16, 2005, the government filed its motion for
a <u>Sell</u> hearing, in which it seeks authority that would allow the
Bureau of Prisons to forcibly administer appropriate medication to
Ballesteros.  A <u>Sell</u> hearing was held September 30, 2005, at which
Defendant, Dr. Christine Pietz (a psychologist), and Dr. Robert
Sarrazin (a psychiatrist) appeared by a remote audio-video link-up.
A further hearing was held November 4, 2005, at which Defendant and
Dr. Sarrazin appeared by audio-video link-up and Dr. Cameron
Quanbeck, a psychiatrist retained by the defense, personally
appeared.

Ballesteros sat in a chair throughout the September 30 and
November 4 hearings and appeared to stare straight ahead most of the
time.  There was virtually no movement of his body.  He was
completely unresponsive, meaning he never spoke, no facial
expressions could be detected, and he did not respond to questions
directed at him asking him whether he would voluntarily take
antipsychotic medication if ordered by the judge.  (Hr'g Tr. 64,
Sept. 30, 2005 ("Sept. 30 Tr."); Hr'g Tr. 2-3, Nov. 4, 2005 ("Nov. 4
Tr.").)

Dr. Quanbeck and Dr. Sarrazin agreed that Ballesteros has a paranoid schizophrenia mental disorder. His symptoms include delusions that the government is putting chips into people for the purpose of digital surveillance, and delusions of grandiosity. His delusional thought processes render him presently incompetent to participate in the defense of this criminal action. Ballesteros is presently confined at USMCFP.

Dr. Quanbeck and Dr. Sarrazin agreed there is a substantial likelihood that treatment would restore Ballesteros to competency and that treatment of him with an antipsychotic medication is medically appropriate. The psychiatrists differ, however, on "the use of injectable medication." (Nov. 4 Tr. 23.)

Dr. Quanbeck's position is dependent on Ballesteros agreeing to take an orally administered antipsychotic drug, which Ballesteros refuses to take.[2] During the January 20 hearing, defense counsel argued an oral dosage could be administered to Ballesteros without his consent if it is placed in a beverage he drinks. The government rejoined Dr. Sarrazin rejects this idea, asserting it would violate his ethical obligation and could prevent him from having a meaningful physician-patient relationship with Ballesteros. Dr. Sarrazin opines Haldol or Haloperidol should be used because it is an injectable immediate-acting antipsychotic

---

[2]

The injectable drug preferred by Dr. Quanbeck, Risperidone Consta, can potentially cause "an idiosyncratic, rare reaction to the medication." (Nov. 4 Tr. 9.) Dr. Quanbeck explained that because the injectable form of Risperidone Consta is long-acting and it is possible "for some length of time [to go by] before the side effects . . . start to manifest themselves[,]" (id. at 19), an oral dose is recommended to test whether an individual is likely to experience such a reaction. (Id. at 9.)

1     medication.  (Id. at 24, 27.)

2          The issue is whether forced medication is warranted as Dr.

3     Sarrazin opines.

4                          Discussion

5          An initial matter when assessing a forced medication

6     request is determining whether principles from Washington v. Harper,

7     494 U.S. 210 (1990) or Sell apply.

8              The Court in Sell emphasized that its
principles were to apply only when determining

9          "whether involuntary administration of drugs is
necessary significantly to further a particular

10          governmental interest, namely the interest in
rendering the defendant  competent to stand trial."

11          Although not explicit on this point, the Court
indicated that the determination of which

12          principles apply -- those of Harper or those of
Sell -- depends on the purpose for which the

13          Government seeks to medicate the defendant.
For example, in explaining that involuntary

14          medication is more appropriate on Harper grounds
than on Sell grounds, the Court advised district

15          courts which are "asked to approve forced
administration of drugs for purposes of rendering

16          a defendant competent" to "determine whether the
Government seeks, or has first sought, permission

17          for forced administration of drugs on . . .
Harper-type grounds."  Thus, for Harper to govern

18          the analysis, it is not enough to demonstrate that
medicating a defendant will prevent him from harming

19          himself or others; the Government must show that the
prevention of such harm was one of the purposes for

20          which it sought authorization to medicate him.

21     United States v. Baldovinos, No. 05-4252, 2006 WL 39270, at *6

22     (4th Cir., Jan. 9, 2006) (citations omitted).

23          Here, the government is not seeking to medicate

24     Ballesteros on Harper grounds; specifically, that "the inmate is

25     dangerous to himself or others and the treatment is in the inmate's

26     medical interest."  Harper, 494 U.S. at 227.  The government argues

27     those grounds are inapplicable because Ballesteros is not a danger

28     in light of his incarcerated status.

Since the government is seeking to restore Ballesteros's competency in order to render him competent to stand trial, and not out of concern that he is a danger to himself or others, the government's motion will be analyzed under <u>Sell</u>.

"[A]n individual has a constitutionally protected liberty interest [under the Due Process Clause] in avoiding involuntary administration of antipsychotic drugs – an interest that only an essential or overriding state interest might overcome." <u>United States v. Bradley</u>, 417 F.3d 1107, 1113 (10th Cir. 2005) (citations omitted). Whether the Government's asserted interest of forcibly injecting Ballesteros with antipsychotic drugs is compelling enough to override Ballesteros's liberty interest in avoidance of involuntary administration of these drugs is decided by determining:

> First, . . . that <u>important</u> governmental interests are at stake. . . .
>
> . . . .
>
> Second, . . . that involuntary medication will <u>significantly further</u> those concomitant state interests. [The court] must find that administration of the drugs is substantially likely to render the defendant competent to stand trial.  At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair. . . .
>
> Third, . . . that involuntary medication is <u>necessary</u> to further those interests.  The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results. . . .
>
> Fourth, . . . that administration of the drugs is <u>medically appropriate</u>. . . .

<u>Sell</u>, 539 U.S. at 181-82.

A.   Importance of Government's Interest

The attempted murder charges against Ballesteros bespeak he has been indicted on serious alleged crimes.

> [I]t is appropriate to focus on the maximum penalty authorized by statute in determining if a crime is "serious" for involuntary medication purposes.  Such an approach respects legislative judgments regarding the severity of the crime. . . .
>
> A focus on a defendant's probable [advisory] guideline range to determine an offense's seriousness would similarly respect legislative judgments, . . . while also giving courts an objective standard to apply. . . . [A] focus [on the advisory guidelines], however, would simply be unworkable because at this stage in the proceedings, there is no way of accurately predicting what that range will be. The final guideline range is computed only after the district court makes findings of fact relevant to sentencing categories. These factual findings are based on the Presentence Report (PSR), which the Probation Office prepares pursuant to testimony presented at trial or the plea and a detailed investigation of the defendant. A focus on the probable guideline range as the barometer of seriousness would shift this fact-finding to a time before the defendant's trial or plea, before the Probation Office prepares its report, and at a time when the district court has already ruled that the defendant himself is incompetent. Fact-finding under these circumstances -- with no PSR and with the defendant unable to testify or render other assistance to counsel -- would be uniquely inappropriate.

United States v. Evans, 404 F.3d 227, 237-38 (4th Cir. 2005)(citations omitted).

Evans concluded that the threatening murder crime before it, which as "a felony whose maximum term of imprisonment [was] 10 years [,was] 'serious' under any reasonable standard."  Id. at 238.

Here, Ballesteros is facing a maximum statutory term of 20 years imprisonment each on Counts 1 and 2, with a mandatory consecutive 10 years statutory term of imprisonment on Count 3.  Given the nature of the attempted murder charges and the 30 years prison term Ballesteros faces, it is clear that important governmental

1    prosecutorial interests are at stake.

2            "The Court must also consider whether special circumstances,

3    such as the potential for a lengthy term of civil commitment that may

4    result from failure to take medication voluntarily and the period of

5    confinement for which the defendant would be given credit if

6    convicted, lessen the importance of the government's interest in

7    [trying the defendant]." <u>United States v. Algere</u>, 396 F. Supp. 2d

8    734, 740 (E. Dist. La. 2005) (citing <u>Sell</u>, 539 U.S. at 180).  The

9    government argues its prosecutorial interests are not lessened by the

10   possibility of Ballesteros being civilly committed because it is

11   unclear whether Ballesteros would be civilly committed if he could not

12   be brought to trial, and indicates its prosecutorial interests

13   override any potential civil commitment.  The government further

14   indicates Ballesteros would only be given confinement credit for

15   approximately two years, which is a fraction of the prison time he

16   faces if convicted.

17           Consideration of these special circumstances does not lessen

18   the government's important prosecutorial interest.

19                 B. Signficantly Further Government's Interest

20           Dr. Sarrazin testified if Ballesteros would agree to

21   treatment, his "initial treatment of choice would be to use a second

22   generation or atypical oral antipsychotic." (Sept. 30 Tr. 27.)  His

23   "first choice would likely be a medication called Abilify . . . and

24   that medication would begin with 18 milligrams." (<u>Id.</u>)  He would then

25   increase the dosage "to 30 milligrams in a short period of time as the

26   medication is tolerated." (<u>Id.</u> at 28.)  He testified that the goal in

27   managing the dosage is to use just the amount of medication necessary

28   to treat the illness. (<u>Id.</u>)  He explained the side effects could be

stomach upset, sedation, tiredness, headache, diarrhea, stiffness, tired eyes, dyskinesia, neuroleptic malignant syndrome, and others. He testified that a psychiatrist monitors the patient for possible side effects to try to avoid or minimize them, and that none of these side effects is likely to interfere significantly with the patient's ability to assist in his own defense.  (Id. at 28-30.)

Dr. Sarrazin testified his hope is that Ballesteros would cooperate and take Abilify orally.  If Ballesteros refused, he would receive one injection of Haloperidol, and he would be offered the opportunity to take an oral dosage of Abilify the next day.  (Nov. 4 Tr. 27.)  Dr. Sarrazin testified if Ballesteros persisted in his refusal, they would know whether Ballesteros was tolerating the Haloperidol "because it's an immediate-acting injectable."  (Id.)  "If he had a bad reaction to the immediate-reacting Haloperidol, it's out of the system in a period of 24 hours, or possibly longer."  (Id.)

The defense objects to use of Haloperidol, asserting that a study showed that 30 percent of those on the medication in Ballesteros's age group developed tardive dyskinesia the first year on the medication.  (Id. at 7.)  Dr. Quanbeck testified that tardive dyskinesia, "if it's severe, it can involve muscles -- it can affect the . . . ability to eat, . . . to talk to some extent, [to] sleep." (Id. at 10.)  The record is silent on what percentage develops these severe side effects.  Dr. Quanbeck testified that the data reveals 60 percent of the group develops tardive dyskinesia after two years of treatment with Haldol Decanoate.  (Id. at 11.)

The record reveals that the administration of the antipsychotics Dr. Sarrazin described is substantially likely to restore Ballesteros's competency to participate in court proceedings;

that the administration thereof can be closely monitored to avoid or minimize side effects; and that the medication will not interfere significantly with Ballesteros's ability to assist counsel during these proceedings.

### C. No Less Intrusive Means

The administration of the medications about which Dr. Sarrazin testified is the only viable alternative to restore Ballesteros's competency, in light of his refusal to be medicated.  No less intrusive option is likely to achieve substantially the same results.

### D. Medically Appropriate

Dr. Sarrazin's testimony that the administration of the described antipsychotic medications is medically appropriate is credited.

### Conclusion

For the stated reasons, the government's motion is granted. Ballesteros shall be confined at USMCFP for 120 days, or a lesser period if reasonably sufficient, so that his competency could be restored.

IT IS SO ORDERED.

Dated:  January 25, 2006

/s/ Garland E. Burrell, Jr.
GARLAND E. BURRELL, JR.
United States District Judge

10